## M. J. VAIDEN ET AL. *v.* R. R. HAWKINS, EXTR. ET AL.

1. CONSTRUCTION OF WILL. *Partial intestacy. Intent.*

   The rule that a will shall if possible be so construed as to avoid partial intestacy, although anciently based in part on the obsolete doctrine that property not disposed of went to the executor, rests now, as formerly, on the ground that where the testator substitutes his will for the law he intends to embrace all his estate.

2. SAME. *Pecuniary legacies. When specific.*

   Pecuniary legacies will not be construed as specific unless clearly made so by the testator's language, especially if such a construction results in a partial intestacy.

3. SAME. *Residuary clause. When partial.*

   Residuary words in a will convey the entire estate, not otherwise disposed of unless they are clearly intended to apply to the residuum of a particular part of the estate.

4. SAME. *Presumption of entire testacy. Ambiguous language.*

   The language in the early part of a will that certain legatees having been provided for, the testator gives them " nothing more by this instrument unless especially mentioned at a subsequent period," does not show an intent of partial intestacy sufficiently to overcome the legal presumption to the contrary.

5. SAME. *Omnibus clause. Case in judgment.*

   The last clause of such a will, which values the testator's property in a commercial firm calling it " assets," makes a contingent bequest, and adds, " this being consummated after the above appropriation out of 'my assets,' I desire the residue to go to heirs of my sister," less cost of a tombstone, and then appoints executors and makes a specific devise, and ends abruptly, is a general residuary clause.

6. SAME. *Valuation. Assets. Juxtaposition.*

   Valuation of the property in the firm does not show an intent to separate it and charge the legacies upon it, the word " assets " applies equally to the testator's whole estate and his property in the firm, and the argument from juxtaposition is destroyed by the fact that so many provisions are crowded into the last clause, which is made a receptacle for all things previously omitted or forgotten.

APPEAL from the Chancery Court of Carroll County.

Hon. R. W. WILLIAMSON, Chancellor.

*Somerville & McClurg* and *Catchings & Ingersoll,* for the appellants.

1. The will contains no general residuary clause. The word

" residue," in the eighth article of the will, does not comprise
the entire estate, but is confined to the undisposed-of portion
of a particular fund, out of which the testator has just made
some specific appropriations. The testator was dealing with a
particular fund, estimated at a certain amount, and the lapsed
legacy of fifty thousand dollars will also fall into the general
residuum, which is not disposed of by the will, and must go to
the next of kin or heirs-at-law. The eighth article begins with
an estimate of the testator's assets in the house of Vaiden, Haw-
kins & Roberts, which would be idle and meaningless, if, as
counsel contend, the subsequent portion of the clause had no
reference to assets in said copartnership. The rule is, that the
words of a will are to receive such a construction as " will give
to every expression some effect, rather than one which will
render any of the expressions inoperative." It was evidently
the object of the testator, in the beginning of the paragraph,
to demonstrate, by his estimate, that his means in New Orleans,
were sufficient for the consummation of the plans and purposes
which he was then about to unfold ; and that there would be an
excess for the Herring children. If the bequest or appropriation
had been made out of his general assets or estate, there would
have been no occasion for the estimate, as there would evidently
have been a large residuum. The testator continues : " I, with
other assets in said house, hope to realize one hundred thou-
sand dollars from this source." It will be observed in the
original that there is not so much as a dash or a comma be-
tween the word " source " and the next sentence : " I desire
my executor to propose to the State of Mississippi to set aside
($50,000) fifty thousand dollars and I a like amount." We
ask no forced transposition of terms or reconstruction of sen-
tences. We insist that the New Orleans fund was in the
mind of the testator, as the source of this bequest ; and we
think no impartial reader, regarding the plain meaning and
close relation of the terms, can interpret it otherwise. Coun-
sel well knew that the fight must be made at this point ; that
the source of this bequest to the State was the source of the
residue for the Herrings. Hence the effort to show that, with
this expression, " I, with other assets in said house, hope to
realize one hundred thousand dollars from this source," the

testator dismissed this subject from his mind.    Why this
abrupt turning from what seemed uppermost in his thoughts?
What do these expressions mean, standing by themselves?    If
the theory of the defendants' counsel is right, why was the ap-
propriation made, and the general residuary clause introduced
at this stage?    Why was not the latter reserved until the con-
clusion, as is usual?    Do counsel maintain that, if the testator
had concluded his will with this residuary clause, the children
of Mrs. Herring would have taken the property which is sub-
sequently devised to Phillips?    Would the " residue " of the
testator's " assets," as bequeathed to the Herrings, include the
plantation subsequently devised to Phillips?    It is certain,
we think, that the testator did not so intend, else the devise
to Phillips would have been in the shape of a reservation or
exception from the provisions of the residuary clause.    It
is argued that juxtaposition alone means nothing, but we
urge that there is something more than mere juxtaposition in
this arrangement.    There is logical and natural sequence in
the construction of these sentences, and there is the observance
of the same method which the testator has used in other para-
graphs of his will.    The testator begins with a recital or
description of property about to be devised, and then proceeds
to direct its distribution or division.

2. The terms used furnish a bond of union between the fund
in New Orleans and the bequest to the Herrings.    Counsel
insist that the word " assets," as used in the clause, " after
the above appropriation out of my assets I desire the residue to
go to the heirs of my sister, Mrs. E. L. Herring," is too general
to mean a particular fund.    Counsel urge that the word here
signifies all the property of a decedent liable to pay debts and
legacies.    The rule is stated by Jarman and Redfield to the
effect, that " words of a comprehensive import ought to have
their full extent of operation, unless some very distinct ground
can be collected from the context for considering them as used
in a special or restricted sense."    1 Jarman on Wills, 604.
Let us test the meaning of this word by this rule.    The
word is a derivative from the French " *assez;* " and its origi-
nal meaning is consequently " *enough.*"    In law it signifies the
effects of a deceased person subject to the payment of his

debts and legacies, or the effects of a bankrupt subject to distribution among his creditors. In commerce, as defined by Bouvier, it means the stock in trade, cash, and all available property belonging to a merchant or company. As generally used and understood, we believe it has the latter meaning, especially among merchants and traders. But its meaning in any particular instrument must be determined by the subject-matter and context. *Noscitur a sociis.* There are distinct grounds from the context for considering it as used here in its commercial sense ; not in its restricted sense. To what does the term " residue " refer? The whole estate had not been mentioned. The testator had only made an estimate of his assets in New Orleans; he had made none of his assets in Mississippi. Why was the estimate made in the one case, and omitted in the other? It may be assumed by counsel for the appellants, very properly we think, that the testator, being a merchant and planter of considerable wealth, must have owed debts, and the attention of the court is directed to his failure to make any provision in the will for the payment of his debts. Is it consistent with the testator's character and reputation, as portrayed by the will, to say that the testator undertook here to dispose of his entire estate without making any provision for the payment of his debts? Such a disposition would certainly have suggested the propriety of providing for the payment of his debts; and we submit that his failure to make such a provision is a strong presumption against the use of the words " assets " as designating effects of a deceased person subject to the payment of his *debts* and *legacies.* Had this been a general residuary clause, the testator would have certainly made a reservation for the payment of his debts. He would also have used some amplifying adjective in connection with the word " residue." As said by the court in *Luckey* v. *Dykes,* 2 S. & M. 60, 70 : " There are no words going before or following after to which the term balance " (residue in this case) " can have relation, which would point to the conclusion that it meant a residuum of the whole estate." Would the residuary clause carry the lands not specially devised? Instead of finding in the will any direction or intimation that such lands should be sold and converted into " assets " we note the disposition on the

part of the testator to entail his realty. There is a manifestation of anxiety lest the devisees should dispose of it. In one case he " lends " a tract of land to a person for life ; in another instance he prohibits the sale of certain real estate, advises that it be leased for a period of years, and says this will be preferable to money at interest. The position of this clause in the will is especially unfavorable to the theory that it conveys real estate. The subsequent devise to Phillips refutes it. Jarman says, in substance, that the circumstance of the general bequest being followed by dispositions of particular portions of the *personal* property to other persons has commonly been considered to favor the supposition that such bequest was not to comprise the general residue. 1 Jarman on Wills, 599. We see no reason why the same rule should not hold in regard to realty. Both real and personal estate are involved. Such expressions as " all my *estate*," " all my *property* and effects," have been construed to carry realty, but even where these words are connected or mixed with words expressing only things personal, the meaning will be limited. 1 Redfield on Wills, 688 *et seq.* The words " estate " and " property" are often confined to personalty by their juxtaposition with words descriptive of that species of property. We reaffirm that the word " assets " in this residuary clause must be confined to the effects in New Orleans. This being true, property unbequeathed will not pass by a residuary clause of a will which especially or by general words points out the sources of the residuary fund. *Luckey* v. *Dykes*, 2 S. & M. 60 ; *Simms* v. *Garrot*, 1 Dev. & Bat. Eq. 393.

3. Courts will " not interpolate nor change the plain meaning " of words to prevent intestacy. Not infrequently persons have taken the precaution to make wills, disposing of portions of their estate and declaring or stating in the instrument that they intended to dispose of the residue by codicil. In Dr. Vaiden's he speaks of not giving certain kinsmen anything unless they should be " specially mentioned at a subsequent period." Take this, with the position of the clause, and the words of the bequest and their context, and it requires much presumption, we submit, to suppose that he intended thereby to grant the great bulk of property which is not mentioned in

the will, without even directing that his debts should be first paid. It is not improbable that he intended to dispose of it by a codicil, and that he purposely reserved it in order to determine, at a subsequent period, who of his kindred were most worthy or most in need of it. It may be that he bestowed upon his kindred all he intended they should have, and perhaps he designed the balance of his estate for some charitable institution or purpose; and that he had not matured his plans when sudden death ended them.

*T. C. Catchings* and *T. H. Somerville*, on the same side, argued orally, and *Catchings & Ingersoll* and *Somerville & McClurg* filed separate briefs.

*J. Z. George* and *Sweatman & Trotter*, for the appellees.

1. There is nothing to indicate that the testator meant to direct the conditional bequest to the State to be paid out of his " interest " and " other assets " in the house of Vaiden, Hawkins & Roberts, except the mere placing of the mention of those two funds in the same article of his will, — an article containing many distinct and independent provisions, — unless, in the absence of punctuation marks, we tear the words " from this source " from their natural and proper place, and annex them to the succeeding sentence. This cannot be done without making both the preceding sentence, thus emasculated, and the succeeding one, thus increased, imperfect in the expression of a complete idea, and, in addition, causing the latter to be absurd. The unnecessary mention of the amount of the fund in this verbose and, if we may use the expression, loquacious will, does not create a charge on it. There may have been no use or propriety in the mention of the amount; yet to create a charge on it, there must be a provision in the will which creates the charge; there must be an intent expressed that the fund is the source of the legacy. It is the duty of adverse counsel to show, not only that the mention of the amount of the fund was unnecessary, but that there is a specific charge made on the fund itself. Unmeaning and unnecessary pleonasms in a will are worthless for any purpose; certainly, they are ineffectual to create a provision which, in an essential particular, changes the destination of property as fixed by other parts of the will, according to the well-settled rules of law.

Mere juxtaposition of distinct and separate ideas in a writing shows only this: That the mind of the writer harbored or entertained them in quick succession, — that is all.   The agreement or disagreement between them — their relation one to the other — is not indicated by contemporaneousness or juxtaposition in the expression of them.   We look to the language used to find this relation, and to that only.   What must the testator have considered and determined in relation to this fund, in case he intended to make the legacy to the State a charge on it, or, in other words, a demonstrative legacy?   If he intended to make it demonstrative, he must have anticipated a necessity for such a demonstration, and have acted on such necessity. There must have been a reason or cause for so making it. The only thing to be gained by making it demonstrative was to prevent its abatement with general legacies, *Malone* v. *Mooring*, 40 Miss. 247; but there is not a single general legacy given in the will.   So that if he determined to make it demonstrative, he determined to do nothing effectually, — to leave the legacy exactly as if it were general; and if he actually accomplished this, he has done nothing, so far as this legacy is concerned, which would not have been accomplished if it had been made general.   It will be noted that there is an entire absence of any words declaring that the legacy shall be payable out of, or charged on, the funds in the New Orleans house. Such words, express or clearly implied, are essential to make the legacy a-demonstration on the fund.   On the contrary, it is expressly declared that the legacy — " appropriation," as it is called — shall be out of " my [his] assets."   " Assets " means the whole estate.   There is no ambiguity or doubt as to its meaning, when applied to the estate of a decedent.   But, strangely enough, counsel for the appellees were driven, in the court below, to contend, and still contend, that " my assets " means only the " assets " in the New Orleans house.   The argument is based on this, — that the testator, in referring to that part of his assets in that house which were exclusive of his interest as partner, had used the word " assets," and hence, as it is argued, he must have confined " assets," in the phrase " my assets," to the property in New Orleans.   This is the same as to argue that if a testator, in one part of his will, uses

the word "property," in the phrase "part of my property," he
evidently means part, and not the whole, in such phrase, when
he says "my whole property." The difference is not in the
meaning of the word but in the qualifications annexed to it.
"My assets," means "all my assets," or, "my assets generally."
"My assets in New Orleans" means that part of them there
situated. Assets in both instances has the same meaning. If
the testator had meant to confine "my assets" to the "assets
in New Orleans," before mentioned, he would have written
"said assets," "aforesaid assets," "aforementioned assets," or
— as in the phrase actually used by him in the same sentence,
"above appropriation" — he would have said "above assets."
If anything except mathematical problems can be demonstrated,
this has been shown to be not a demonstrative but a general
legacy. This being so, it ends the controversy; for there can
be no pretence that the residuary clause is limited and
restricted, if this be not a demonstrative legacy.

2. If this is a demonstrative legacy, however, the appel-
lants still have not reached the position that the testator
died intestate as to any part of his estate. Whether a
residuary clause be general, or only limited to a particular
fund, depends upon the intention of the testator. And on
this question of intention, there are well-settled rules, from
which we are not allowed to depart. The courts have for
a long time inclined very decidedly against adopting any con-
struction of wills which would result in partial intestacy,
unless absolutely forced on them. 2 Redfield on Wills, 116,
444, § 5. The fact of making a will raises a very strong pre-
sumption against any expectation or desire, on the part of the
testator, of leaving any part of his estate beyond the opera-
tion of his will. 1 Jarman on Wills, 364; 2 Roper on Lega-
cies, 1629; *James* v. *Irving*, 10 Beav. 276; *Bland* v. *Lamb*,
2 Jac. & Walk. 399; *Boys* v. *Morgan*, 3 Myl. & Cr. 661;
*Evans* v. *Jones*, 2 Col. C. C. 516; *Attorney General* v. *Johns-
tone*, Ambler, 577; *Cambridge* v. *Rous*, 8 Ves. 12; *Leake* v.
*Robinson*, 2 Meriv. 363; *Davers* v. *Dewes*, 3 P. Wms. 40;
*King* v. *Woodhull*, 3 Edw. Ch. 79.

3. If the residuum was, however, partial and limited, still
the Herring children take the lapsed legacy of fifty thousand

dollars, the residuum including that. While the rule is firmly established that whatever by lapse, or invalid disposition, or otherwise, turns out, in effect, not to pass under that portion of the will which deals specifically with it, falls into the residuum, it is not denied that the testator may, by a clear and distinct provision to that effect, exclude all such. 1 Roper on Legacies, 457. But the bequest of what shall remain of a fund after payment of legacies out of it does not have this effect. When the residuary clause is thus worded, the legatee is as much a general legatee of the residuum as if such words were not used. *Shanly* v. *Baker*, 4 Ves. 732. In *Roberts* v. *Cooke*, 16 Ves. 451, a general residuary bequest of real and personal estate, " not hereinbefore specifically disposed of," was held to comprehend the specific legacies before disposed of which lapsed. In the case of *Tindall* v. *Tindall*, 24 N. J. Eq. 512, after certain general legacies and a gift of five thousand dollars to his wife, the residuum of the estate was disposed of as follows : " I give and bequeath whatever of my property shall remain after payment of above and due settlement of all my business." The legacy to the wife lapsed, and the next of kin claimed it. The court gave it to the residuary legatee in a learned opinion, declaring that the phrase " after payment " in no wise limited or restricted the bequest, which had precisely the same meaning and effect as if it had been in terms a bequest of the residue of the estate. Similar to this are *Taylor* v. *Taylor*, 6 Sim. 246 ; *Crooke* v. *De Vandes*, 9 Ves. 197 ; *Falkner* v. *Butler*, Ambler, 514 ; *Oke* v. *Heath*, 1 Ves. Sr. 135 ; *Markham* v. *Ivatt*, 20 Beav. 579.

*J. Z. George* and *Walter Trotter*, on the same side, made oral arguments, and *Sweatman & Trotter* and *J. Z. George* filed additional briefs.

CHALMERS, C. J., delivered the opinion of the court.

The appellants, who are two of the heirs-at-law of the late Dr. Cowles Meade Vaiden file this petition, seeking distribution to themselves of such portions of his estate as they claim are not disposed of by his last will and testament, as also of a legacy of fifty thousand dollars, bequeathed by him to the State of Mississippi for certain purposes, and upon certain conditions,

which were by the State rejected. The validity of their claim depends upon whether the will contains any clause by which the general residuum of the estate, after the deduction of special legacies, was intended to pass. Such residuary clause, if to be found at all, is found in the last (eighth) item of the will. The will is holographic in fact, though attested by witnesses, and is entirely destitute of punctuation marks, except an occasional straight line or dash which is used for a period. We give the eighth clause, however, punctuated and divided as it is conceded that it should be.

"8. My interest in the house of Vaiden, Hawkins & Roberts of N. O. amounting to seventy-five thousand dollars, I wish to remain in the house, until the dissolution of said co-partnership. I, with other assets in said house, hope to realize one hundred thousand dollars from this source. I desire my executor to propose to the State of Mississippi to set aside ($50,000) fifty thousand dollars, and I a like amount ; the State to pay annually eight per cent interest, sacred to the education of poor young men at Oxford, on my mess system, which I hope to live long enough to explain and show its great utility and benefit to the State at large. This being consummated, after the above appropriation out of my assets, I desire the residue to go to heirs of my sister, Mrs. E. L. Herring, less five thousand dollars, for the erection of a suitable monument to mark the spot where I may be buried. I desire my dear wife to have inscribed on my tomb whatever she may desire, and I further authorize her to use any amount, additional to the five thousand dollars, she may wish. I appoint my dear wife my executrix, and R. R. Hawkins my executor, and in no wise to give bond and security for the fulfilment of their duties. I also lend to T. J. Phillips, his natural life, the land in section twelve I bought of M. A. Wilson early this year, and that bought of O. O. Caldwell and Jo. Wilson, making about two hundred and seventy acres, upon which Charles Davis, Jo. Christian and Peter Williams reside, during his natural life, and at his death in fee to his children, if any, and if none, to those of his sister.

Given under my hand and seal the day and date above written.

COWLES MEADE VAIDEN. [SEAL.]

Witness

    J. W. HARVEY,
    C. M. VAIDEN, Jr.,
    S. E. McCONNICO.

It will be observed that the clause commences with an allusion to the interest of the testator in the mercantile firm of Vaiden, Hawkins & Roberts, of New Orleans, which is stated to be seventy-five thousand dollars. This he directs to be left

in the house until its dissolution, a period in the future pre-
sumably fixed by the articles of copartnership.   He then inti-
mates that, in addition to his interest in the firm, he has further
individual property in the custody of the house, from which,
combined with his other assets in the house, he hopes to real-
ize one hundred thousand dollars.   Immediately follows the
bequest to the State, or rather a direction to his executors, to
propose to the State that it shall set aside fifty thousand dol-
lars, and he (or rather his executors) a like amount.   Upon
the aggregate of which two amounts, the State shall annually
pay interest at the rate of eight per cent, to be expended in the
education of poor young men at the State university at Oxford,
upon a scheme devised by him which he hopes to live long
enough to explain.   The testator died a few weeks after
the preparation of his will, and the legislature rejected the
proposition of his executors to carry out this portion of the
will.   The will continues in these words " this being consum-
mated, after the above appropriation out of my assets, I desire
the residue to go to heirs of my sister, Mrs. E. L. Herring, less
five thousand dollars for the erection of a suitable monument,"
&c.   Then follows the appointment of his executors, who are
in no event to give bond; and the will closes abruptly with a
devise of a tract of land to T. J. Phillips and his children.
There are, in previous clauses, numerous special legacies and
devises ; but it is admitted that one tract of land and much per-
sonalty are undisposed of unless they pass to the heirs of Mrs.
Herring under the eighth item.   Did Dr. Vaiden die intestate
as to any portion of his estate not specifically disposed of by
other clauses of his will, or did such portions pass, under the
sentence last quoted, to the heirs of Mrs. Herring?   That is
the question presented by this litigation.

   The theory of the appellants is, that the whole of the eighth
item of the will, down to the appointment of the executors, is
devoted to the disposition of the New Orleans property, which,
for the purpose of making such distribution of it as he desired,
is estimated and fixed at one hundred thousand dollars.   Out
of this New Orleans property he had already by a previous
clause directed that a ten thousand dollar United States four
per cent bond should be purchased for his wife.   By the eighth

item, say the appellants, he disposed of the remainder of that property, appropriating out of it the sum of fifty thousand dollars for the proposition to be made to the State, and the further sum of five thousand dollars, or such additional amount as his wife might desire, for the erection of a monument over his grave; leaving the residue of it to go to the heirs of Mrs. Herring. The appellants insist further that the proposed legacy to the State, and the sum set apart for the monument, are specific and demonstrative in their character, and that, by fixing or estimating the entire amount of the fund out of which they were to come, he thereby signified his intention, or rather that the law will from these circumstances deduce the legal conclusion, that, in the event of the failure of either of the specific legacies to take effect, such legacy will lapse to the heir-at-law and not to the residuary legatee of the fund.

The three principal things relied on in support of this construction are, first, the otherwise unnecessary act of the testator, in fixing an estimate upon the value of the New Orleans property; second, the immediate juxtaposition of the proposition to the State with this estimate of the value of the New Orleans property; and third, the use of the word " assets " in speaking of the legacy to the State as being appropriated out of " my [his] assets; " which same word had indubitably been used a few lines above, as referring exclusively to the New Orleans property, from which use of it it is argued, that, in the second instance, it was employed as pointing to the same fund. Suggestive as these things may seem, they are not conclusive, and are not sufficient to overcome the strong presumptions of law against this construction.

Why the testator chose to speak of the probable value of the New Orleans property, does not clearly appear, but the fact that he does so, is not enough of itself to indicate that he thereby intended to segregate it from the balance of his estate, and to so deal with it that the legacies immediately following its mention should be carved out of it alone, and should be carved out in such manner that they should wholly fail if it failed, or abate in such proportion as it failed to come up to the estimate placed upon it, but in no event should go beyond the amounts severally specified, nor should the residuum even be

increased by the lapse of any one of the specific legacies, but that the legacy so failing to take effect should pass to the heir-at-law. Cases in which a construction so rigid as this has been placed upon a testamentary disposition are rare and exceptional, and nothing short of an intention clearly and unmistakably expressed will support them. Such constructions, it is said, " have not been well received by the courts or the profession." 2 Redfield on Wills (2d ed.) 120.

The juxtaposition of the proposed legacy to the State with the allusion to, and estimate of, the New Orleans property would be potent, if the whole clause was unmistakably devoted to a disposition of that property, but clearly this is not so. The testator seems to have made this final clause of his will a receptacle into which he has crowded every testamentary desire not elsewhere expressed. Thus his instructions that his interest in the mercantile firm should continue there, his proposition to the State with reference to the education of poor young men at Oxford, the monument to be erected over his grave, the appointment of his executors, who should give no bonds, and the devise of land to Phillips, are all found in this clause. It seems most improbable that he intended to make the provision for his tomb, the cost of which beyond five thousand dollars was left wholly discretionary with his wife, a charge upon the New Orleans property alone, and entirely dependent upon that property. It is hardly less so, that the legacy to the State was likewise so designed. There were ample assets belonging to his estate outside of this fund for the accomplishment of these purposes, and there is nothing to indicate that these two schemes depended for either their extent or their existence on any particular portion of his estate. If they had been found in different clauses of the will, such an idea would probably never have occurred to anybody, and the argument from juxtaposition is, we think, overthrown by the heterogeneous character of other provisions contained in this final clause.

We attach little importance to the fact that the testator used the words "assets," both in speaking of the New Orleans property, and in referring to the legacy to the State, as being appropriated out of his "assets." The word (derived from

the French *assez*, enough), is given by both legal and literary lexicographers the double signification of the property of a deceased person appropriable to the payment of his debts, and the entire property of a mercantile firm or trading corporation ; but at this day these are not two different meanings, but rather one and the same idea applied merely to different things. All the property of a deceased person (save the small amount exempt by law) is appropriable to his debts ; and the same thing is true, without the exemptions, in reference to the property of a mercantile firm or trading corporation, so that the term was equally applicable either to the New Orleans property or to the entire estate. It is synonymous in both cases with the word "property," and certainly, if the latter word had been used, no deduction favorable to the appellants' construction could have been thence inferred. If it was intended to use the word in both instances, as referring each time to the same specific property, it seems most probable that the second time some such expression as "such assets" or "said assets" would have been employed, instead of the more general and all-embracing term "my assets."

We think the utmost that can be said in this connection is, that the testator looked to the New Orleans property as affording his executors a convenient and ready source for carrying out his educational and monumental plans, and he may have had that property in contemplation when he penned these lines, but we fail to see that he made the one dependent upon the other, or that he so eliminated the New Orleans property from the body of his estate, as that it should be administered and dealt with as a thing apart from all else.

Since one dollar is as valuable as another, the courts never construe pecuniary legacies as specific, unless clearly so made by the language of the will, and they lean even more strongly against affixing such a construction to a will, as to produce partial intestacy. It is doubtless true as argued by counsel that this indisposition was much strengthened in early times by the common-law rule that all property not effectively disposed of went to the executor in his own right, and therefore, to prevent the injustice to the heirs often wrought by this rule, every. device was adopted to defeat it. But it rests upon the firmer

suggestion of common sense, a suggestion now and always weighty, that when a man rejects the disposition of his property which the law makes, and puts himself to the trouble of preparing a will, he does not intend to leave himself intestate as to any portion of his estate. Whatever may have been the origin of the doctrine, or the reasons by which it may be supported, it is no less true now than formerly that the courts are reluctant to adopt a construction that will lead to partial intestacy, and will not do so, Judge Redfield says, " unless absolutely forced upon them." 2 Redfield on Wills (2d ed.), 116. Whenever therefore any residuary words are found in a will, they will be held to convey the entire estate, not otherwise disposed of, unless it can be shown that they are clearly intended to apply to the residuum of a particular portion only. 2 Redfield on Wills, *ubi supra*, and cases cited ; 2 Jarman on Wills (5th ed.), 364 *et seq.*, and cases cited.

It is urged that the testator affirmatively shows in his will that he did not himself understand, that he was finally disposing of his entire estate, because, in the latter portion of its third clause, he uses the following language : " Having provided amply for Virginia C. Vaiden and Emily P. Evans, daughters of my sister Mrs. E. C. Phillips, I give them nothing more by this instrument unless specially mentioned at a subsequent period." It is insisted that this language shows that the testator did not then intend to complete his testamentary intentions, but expected at some " subsequent period " by a codicil to dispose of that portion of his property, which he then reserved for future action. We think that his meaning was that unless at some subsequent period in the preparation of the will he indicated an intention to give these parties something, they were to expect nothing. This seems apparent from the use of the word " mentioned." When the writer of a document speaks of something to be subsequently " mentioned," we must understand him as referring to something which is to be thereafter alluded to in that paper. If it were something to be mentioned in some other paper, to be prepared at another time, the language would be different. He would probably say " unless at some future period I shall otherwise direct or determine," or an equivalent form of expression.

Upon the whole we cannot say that the appellants have met the burden imposed by law upon them of showing clearly that the testator died partially intestate, or that the residuary words found in the last clause of the will were intended to apply to a particular fund only. On the contrary, we are of the opinion that the heirs of Mrs. Herring are the true residuary legatees of the entire estate, and as such entitled to take all the property belonging to it not otherwise disposed of, including the lapsed or non-effective legacy to the State.

Our own labors in the case have been greatly lightened by the exceptionally able and exhaustive arguments, oral and written, of the counsel on either side.

*Decree dismissing petition affirmed.*